[No. 4138.]

## Thomas L. Stanley *v.* The State.

1. Practice—Continuance.—See the statement of the case for circumstances under which it is *held* that certain applications for continuance were properly denied.
2. Same—Case Stated.—This case was set for trial on the third day of April. On the fifth day of that month, and while the trial was in progress, the defendant asked for a continuance to procure the testimony of a certain witness. The application showed the necessary diligence in suing out an attachment for a witness who was under subpœna, and who had been in attendance upon the court during the previous days of the term, but was found to be absent on the day set for the trial. As a fact, however, this attachment did not issue until the next day, and was then returned not served. *Held*, that, having gone into trial, the defendant was not entitled to a continuance, unless he could show that, by some unexpected occurrence since the trial began which no reasonable diligence could have anticipated, he was so taken by surprise that he could not secure a fair trial. This application, however, shows no such sur-

prise, and the court did not err in refusing the continuance at the stage of the proceedings at which it was asked.

3. SAME—NEW TRIAL.—It is a rule of practice in this State that, even when an application for continuance lacks some of the statutory requirements, if the proposed evidence appears material and true, it should be considered and weighed in connection with the evidence adduced, on the motion for new trial. This rule must be held to apply equally to an application for a continuance which, like this for instance, is irregular and unauthorized. The evidence set forth in the application in this instance being clearly material and probably true, the same should have been considered on the motion for new trial. See the statement of the case for the proposed evidence referred to.

4. SAME—PLEADING.—It is only when the proposed absent testimony upon which a motion for new trial is based is claimed to be newly discovered that the affidavit of the absent witness to the effect that he would testify as stated in the motion is necessary to the validity of the motion. In all other respects it is only when the State has taken issue with the defendant on the truth of the matters set forth in the motion for new trial that the trial judge is required or authorized to hear evidence by affidavit or otherwise. The affidavit of the absent witness, in this case, was not essential to the validity of the motion.

5. MURDER—IMPLIED MALICE—CHARGE OF THE COURT.—Upon the question of implied malice the trial court gave in this case the same charge it gave in the case of *John Turner* v. *The State, ante,* page 378. For the ruling which is adopted in this case, see that case.

6. SAME—RIGHT TO REPEL INVASION OF HOME.—Upon the right of the deceased to repel an intrusion upon his home premises, the court charged the jury "that entering into a quarrel or an angry verbal altercation with the occupant of the home premises, against his consent, in the presence of his wife and children, if he has any, would be improper conduct in the sense here used." *Held,* error, as being a charge upon the weight of evidence.

7. CHARGE OF THE COURT—PRACTICE—CASE STATED.—On the trial, the State proved, amongst other things, that another party, who was charged in a separate indictment with the same offense, told defendant that he would whip defendant if he did not stand up to what he had said; that the appellant did not want to go with the other parties separately indicted for this offense to the house of deceased; that defendant said he feared a difficulty if they went; that defendant *en route* expostulated against going, and that defendant was a man of peaceable disposition. In view of this and other evidence, the defense asked the following charges of the court: "If you believe from the evidence that John and Britton Turner, by threats or otherwise, exercised undue influence over the person of the defendant, sufficient to overcome the mind of an ordinary man, and thereby induced him to accompany them to the residence of the deceased, then he was excusable in being there." "If you believe from the evidence that the defendant was a mere trespasser upon the premises of the deceased, or was brought there by undue influence exercised over his mind by threats or otherwise from John and Britton Tur-

ner, sufficient to overcome the will of an ordinary mind, and that defendant used no insulting words or threatening gestures previous to the attack of the deceased, then the deceased was not justifiable in doing him serious bodily injury except in defense of himself and family." *Held*, that whilst the charges asked were not critically correct, nor based upon such facts as would bring the case within the letter of the statute which makes duress a complete defense for acts otherwise punishable, the charges were within the spirit of that statute, and, under the peculiar circumstances of this case, their refusal was error.

APPEAL from the District Court of Houston. Tried below before the Hon. J. R. Kennard.

This is a companion case to that of *Turner* v. *The State, ante*, page 378, the indictment, though separate, charging the same murder, that of G. W. Montzingo, in Houston county, Texas, on the twenty-seventh day of October, 1883. The conviction, like that in Turner's case, *supra*, was for murder in the second degree. The penalty awarded in this case was, however, much greater, a term of fifty years in the penitentiary being assessed.

Fletcher Thomas was the first witness for the State. He testified that he saw the defendant in the town of Lovelady with the Turner boys and the deceased late in the evening on which the killing occurred. John Turner told Montzingo to take an ax handle and frail the defendant.

Cross-examined, the witness stated that he was not in the town of Lovelady on the morning, but saw the defendant and John and Britton Turner together in that town in the evening of the day of the killing. They were then standing in front of Saunders's saloon. Immediately after John Turner told the deceased to frail the defendant with an ax handle the witness left, and the deceased and others left a short time later. The deceased left town sober, but had, the witness thought, a bottle of whisky with him. Defendant and deceased had no difficulty *en route* home, so far as the witness knew, though they had some words concerning a saddle. Four miles is the distance from Lovelady to the deceased's house. The defendant overtook the deceased on his way home, about two miles out from Lovelady, and offered to make friends. The deceased agreed to make friends on the morrow. The defendant proposed that he would whip the deceased if he would get out of the wagon. Defendant and deceased lived between one-quarter and one-half mile apart. Witness did not know the state of feeling between them, nor the feeling between the Turner boys and the deceased.

Arthur McManners was the next witness for the State. He testified that before sundown on the evening of the killing, he saw the deceased in the town of Lovelady. Deceased asked for a seat in the witness's wagon to ride home, and put a saddle in the wagon. The defendant asked the deceased to lend him the saddle to ride home. The deceased agreed to lend the saddle to defendant, but afterward, when it was thrown out to him, the defendant refused to take it. Afterward, when he wanted it, deceased refused to let him have it. The defendant overtook the deceased about a mile out from Lovelady, whether drunk or not the witness could not say. The deceased had whisky with him. Witness did not remember what was said by the parties about making friends. Stanley was left about a half mile distant from the house of the deceased.

Mrs. Montzingo was the next witness introduced by the State. Her testimony in this case was substantially the same as that she gave in the trial of John Turner, for the report of which see *ante,* page 378. In addition to her evidence in Turner's case, she said that when Britton Turner called by her house on the morning of the homicide, for the deceased to go with him to Lovelady, the deceased declined to go with him, because he had already promised to go with Doctor Glover. He did go to town with Doctor Glover. She did not know what, if anything, John Turner said to the defendant just before or at the time of the cutting.

Doctor Glover, for the State, repeated in substance his testimony on the trial of John Turner, and gave it as his opinion that the cutting was done inside of the yard and about two feet from the gate.

The testimony of Henry Montzingo, the next witness for the State, did not vary materially from his evidence on the John Turner trial, though it did not enter as minutely into detail.

C. P. Summers was the next witness for the State. He testified that on the night of the killing, after it had occurred, the defendant came to him and put himself under his protection. He told the witness that he had killed Montzingo. Witness asked him why he did it, and he said that he did not like to tell. He told witness that he would never get justice until his neck was broken. The defendant at that time was under the influence of whisky.

On his cross-examination, the witness said that he had known the defendant but a short time. On the night in question the

defendant told him that John and Britton Turner were with him; that Britton Turner told him that if he did not stick up to what he had said, he would give him the d—dest whipping he had ever had. He said: "You don't know as much about this thing as I do." He further told the witness that the deceased struck him over the head and on the hand. Witness saw bruises on his head and hand, which he had tied up. Defendant declared to the witness that he had no grievance against the deceased, Montzingo. During this conversation he showed the witness a knife, with which he said he killed the deceased. The difference in the sizes of deceased and defendant, if any, was slightly in favor of the defendant. Deceased was about forty years old.

The wife of the defendant was the first witness introduced in his behalf. She testified that she was at the house of old man Turner when her husband, the defendant, returned from Lovelady. The Turner boys were then out at the lot. They and the defendant had some conversation, which the witness did not hear. She heard her husband tell the Turner boys that the deceased said for them to come to his house. John Turner then got on a horse, and told the defendant and Britton Turner to go with him. Defendant objected to going, and said that he was afraid if they went there would be a difficulty, and that he was in no condition to get into one. The party, the two Turner boys and the defendant, finally got on their horses and rode off in the direction of the deceased's house. The defendant was a man of peaceable disposition. The witness had never known him to provoke a difficulty with any one.

Bob Stevens was the next witness for the defense. He testified that late on the evening of the homicide he was watering his oxen in a deep gully near the road which ran between the houses of Turner and deceased. Witness lived on that road between the two houses named. While watering the oxen he heard and recognized the voices of defendant and John Turner. The defendant was protesting about going any further. John Turner replied: "No, we will go to the d—d old son of a b—h's house." The impression left on witness's mind was that defendant did not want to go. Witness knew the voices to be those of defendant and John Turner, though he did not see them. Witness heard cursing and loud talking at the deceased's house, and afterward saw John Turner, defendant and Buck Shaw return-

ing from the direction of deceased's house. John Turner then had a gun.

Doctor J. J. Woodson testified that he was called to visit the defendant after he was confined in jail. He found a bruise on his head and another on his hand, and dressed them for him. They appeared to have been inflicted by some hard instrument.

The application for continuance, which forms the subject matter of the first head note of this report, was based upon the absence of the witnesses John Stanley, of Trinity county, Lester Tims, of Walker county, and John Clark, of Houston county. The application alleged the use of due diligence, in that attachments had been issued for the first two, and a subpœna for the last witness. By the witness Lester Tims, the application alleged the defendant would prove the conversation that passed between the defendant and John and Britton Turner, and the influences that were brought to bear upon defendant's mind, compelling him to go the house of the deceased. By the witness Clark, it was alleged, would be proved the conversation between the defendant and the deceased, and the entire absence of any ill feeling between the defendant and deceased. By the witness John Stanley, who was his oldest brother, the defendant expected to prove that he, defendant, was a peaceable, law abiding, inoffensive man, who had never before been in a serious difficulty; one who was naturally timid and would avoid a difficulty, even at the risk of being stigmatized as a coward, but at the same time a man of such disposition that he could be influenced by threats or persuasion; such a man, in short, as, under the circumstances of this case, would have no mind of his own sufficient to prevail against the influences brought to bear upon him. The bill of exceptions recited error in the refusal of the continuance, wherein the court held it insufficient as an application, because not showing upon its face the materiality of the testimony; because only conversations, not the substance or facts of the conversations, were set out; because no diligence was shown, notwithstanding counsel had been appointed for the defense three days before trial, and had not caused proper process for the witnesses to be placed in the hands of the sheriff.

The trial judge signed this bill of exceptions, with explanations in substance as follows: The defendant was brought into court on the sixth, seventh and twenty-sixth days of March, 1884, for the purpose of appointing counsel. Each time he requested the

postponement of such appointment pending his efforts to employ counsel. On each occasion he was told to procure process for such witnesses as he desired, counsel volunteering to give him assistance. When the motion for continuance was overruled, he was awarded attachments for the witnesses named in his application, and one of them, John Clark, was brought into court before the defense testimony was closed, and defendant's counsel was notified that said witness, and another named in the same attachment, were in court, but counsel declined to put them on the stand. Defendant's counsel at that time failed to have an attachment issued for the witness Lester Tims, who at that time was a resident of Houston and not Walker county; and further, that the attachments called for by counsel were not called for until April 4, although by direction of the court officers were at the service of the defendant on the third day of that month.

The application for continuance, the refusal of which was assigned as ground for new trial, and is the subject matter of the third head note of this report, was based upon the absence of the witness Buck Shaw, by whom the defendant alleged he could prove that the defendant and the deceased were on terms of friendly intimacy, and visited each other frequently; that Buck Shaw was at Turner's house on the evening of the homicide, and the sisters of the Turners besought him, Shaw, to go and bring the boys back and prevent a difficulty; that when said Shaw reached the house of the deceased, defendant was retreating and deceased was following him up, "whaling" him over the head with an ax handle; that the witness Shaw and the sister of John and Britton Turner had frequently visited the house of the deceased; that illicit intercourse was practiced by them, which fact was discovered by deceased and reported to old man Turner, the father of said John and Britton Turner, which said disclosure created hard feelings between said John and Britton Turner and the deceased, and that an unfortunate circumstance afterward occurred in the family of old man Turner, to-wit, the birth of a child to his said daughter.

The motion for new trial brought into review the questions discussed in the opinion.

*W. A. Stewart* and *S. A. Denny,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. It appears from the record that this case was called and proceedings preliminary to the trial commenced on the third of April. One or more motions for continuance were made prior to the announcement of ready for trial by defendant, and were overruled. These applications, when considered in the light of the judge's explanations of his rulings upon them, and in connection with the evidence adduced on the trial, do not appear to have been improperly refused.

On the fifth of April, and whilst the trial was in progress, the defendant made another application for a continuance on account of the absence of one Buck Shaw, showing all the necessary and requisite diligence in suing out an attachment when the witness, who was under subpœna and had been in attendance on previous days of the term, was found to be absent on the third of April, the day the case was set for trial. This attachment, however, did not issue in fact until the fourth, and was on the same day returned not executed, because the witness could not be found.

Having gone into the trial, the defendant was not entitled to a continuance unless he could make it appear, to the satisfaction of the court, that by some unexpected occurrence since the trial commenced, which no reasonable diligence could have anticipated, the appellant was so taken by surprise that a fair trial could not be had. (Code Crim. Proc., Art. 568.) No such surprise is shown in the application before us, and the court did not err in overruling it at the stage of the proceedings at which it was presented.

Not being a regular, or, we may say, an authorized application for continuance, was it entitled to any consideration in connection with the other evidence, when the court was asked to grant a new trial, as would have been the case had said application been presented at the proper time? (Code Crim. Proc., Art. 560, subdiv. 6.) We are not aware that this exact question has ever been before the court. We find, however, that in more than one instance when an application has lacked some one of the statutory requirements, but the proposed evidence appeared material and probably true, it has been held that it should have been considered and weighed on the motion for new trial. And the same rule, we think, should apply here. In explaining why it was not considered on the motion for new trial, the learned judge does not base his action on the fact that the application was not authorized by law, but seems to rely for his

action mainly upon the fact that, in support of this ground of his motion for a new trial, the defendant failed to produce the affidavit of Buck Shaw, the absent witness, to the effect that he would testify as was proposed in the application for continuance, or what facts he would testify to if a new trial should be granted. If the evidence had been claimed as newly discovered, then, indeed, the supporting affidavit of the proposed witness would have been requisite to the validity of the motion. (Code Crim. Proc., Art. 777, subdiv. 6; Clark's Crim. Law of Texas, p. 571, note, sec. 6.) In all other respects, it is only when the State has taken issue with the defendant upon the truth of the causes set forth in the motion for new trial that the judge hears evidence by affidavit or otherwise, to enable him to determine the issue. (Code Crim. Proc., Art. 781.) When not controverted, and not based upon newly discovered evidence, no supporting affidavits are required. If the State took issue on and controverted the motion in this case, the record fails to show it. In our opinion the proposed evidence of Buck Shaw was material, and, considered in connection with other testimony shown in the record, was probably true. Nor does it answer the purposes for which his testimony was sought to say that the wife and son of the deceased had testified to many of the facts to which he was expected to bear witness. The witness Shaw was the only other eye witness to the transaction except deceased's wife and son, and they became involved in it as participants before it was over. It may have been all important to defendant to have a witness detail the occurrences of the transaction who was not a participant in it in any way.

The charge of the court is quite voluminous, and many propositions of law are submitted which, in our opinion, were irrelevant to the case as made by the facts proven, and were calculated to confuse, if not to mislead, the jury. This is, in a measure, we suppose, attributable to the fact that the learned judge had only a short time before tried another branch of this case wherein the relations of the parties to the transaction were somewhat variant from those presented in this record. Some of the errors pointed out in the John Turner case (*ante*, p. 378) have been corrected in the charge in this case, but the same charge upon "implied malice" was given, and we refer to that case for a discussion of its sufficiency. With the exception of one or two particulars to be mentioned, we are of opinion that it submits correctly the law upon the main features of the case.

In charging upon the rights of a party in defense of his home and premises against the intrusions of trespassers or those guilty of improper conduct after entering by invitation of the owner or occupant, the learned judge, we think, infringes upon the province of the jury by declaring as law a matter which they alone should have determined, if so, as matter of fact, in instructing them "that entering into a quarrel or any angry verbal altercation with the occupant of the home premises, against his consent, in the presence of his wife and children, if any he has, would be improper conduct in the sense here used." We are of opinion that this instruction was a charge upon the the weight of evidence, and, taken in connection with the context, was calculated to impress the jury that defendant had been guilty of such improper conduct as warranted the deceased in the exercise of extreme means and force to eject him from the premises.

On the trial, the State proved the statements of the defendant Stanley made to one Summers after the homicide. Amongst other things, appellant told the witness that Britton Turner, a party who was indicted in another case for this same murder, said that "if he (Stanley) did not stick up to what he said, he would give him the d——dest whipping he ever had." It was in proof that appellant did not want to go with the Turners to the house of deceased; that he said he was afraid, if he went, they would get into a difficulty; that he was a man of peaceable disposition, and that, after they started to the deceased's house, appellant expostulated with the others, and did not want to go. In consideration of these facts and other evidence in the record, defendant's counsel requested special instructions from the court to the jury, which were refused. These instructions were: "If you believe from the evidence that John Turner and Britton Turner, by threats or otherwise, exercised undue influence over the person of Thomas Stanley, sufficient to overcome the mind of an ordinary man, and thereby induced Thomas Stanley to accompany them to the residence of G. W. Montzingo, then he was excusable in being there." Again: "If you believe from the evidence that Thomas Stanley was a mere trespasser upon the premises of G. W. Montzingo, or was brought there by undue influence exercised over his mind by threats or otherwise from John and Britton Turner, sufficient to overcome the will of an ordinary mind, and that Stanley used no insulting words or threatening gestures previous to the attack of Montzingo, then

Z

G. W. Montzingo was not justifiable in doing him serious bodily injury, except in defense of himself and family."

Now, whilst these instructions were not, perhaps, critically correct, and were based upon a state of facts which would not bring the case within the letter of the statute which makes duress a complete defense for acts otherwise punishable (Penal Code, Art. 43), still we believe they are within the spirit of that statute, and, under the peculiar circumstances of the case, should have been given in charge to the jury.

Several other errors are assigned, but the questions are such as are not likely to arise on another trial. Because of those discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered June 4, 1884.